# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY SAMUEL CATO, | CASE NO. 1:03-cv-05490-AWI-GSA PC |
| Plaintiff, | ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DIRECTING CLERK TO ENTER JUDGMENT |
| v. | |
| DEPARTMENT OF CORRECTION TERHUNE, et al., | |
| | (Docs. 170 and 181) |
| Defendants. | |

I.   Defendants' Motion for Summary Judgment

   A.   Procedural History

Plaintiff Anthony Samuel Cato ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in a civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on Plaintiff's fourth amended complaint, filed January 23, 2004, against (1) Defendants Andrews, Grandy, Weaver, Fehlman, Warren, Cheema, Rojas, Casillas, Loflin,[1] Hernandez, Romero, Licon, Espinoza, Fisher, Oseguera, and Do Canto[2] under the Eighth Amendment based on food tampering; (2) Defendants Brown, Pitts, Hasadsri, Dang, Andrews, and Suarez[3] under the Eighth Amendment for acting with deliberate indifference to Plaintiff's medical needs; (3) Defendants Oseguera and Key under the Eighth Amendment for use of excessive force; and (4) Defendants Pitts and Andrews

---

[1] Identified as Lofflin in the complaint.

[2] Identified as Docanto in the complaint.

[3] Now known as Morales.

1

under the Due Process Clause based on Plaintiff's claim that he was drugged and tests were conducted on him while he was unconscious.[4] On July 2, 2007, Defendants filed a motion for summary judgment. Plaintiff filed an unverified opposition on August 15, 2007, and the motion has been deemed submitted.[5] Local Rule 78-230(m).

       B.      <u>Legal Standard on Summary Judgment</u>

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

///

---

[4] On December 23, 2004, Plaintiff's claim that he was deprived of his property without due process was dismissed for failure to state a claim upon which relief may be granted, and Defendants Terhune, Scribner, Dill, Rousseau, Lawton, Trujillo, and Vallejo were dismissed from this action based on Plaintiff's failure to state any claims upon which relief may be granted against them. (Doc. 39.) On January 30 and 31, 2007, the Court issued orders dismissing Defendants Jackson, Williams, Smith, Alcantar, Molina, Cruz, Chambell, and Reynoso from this action pursuant to Federal Rule of Civil Procedure 4(m). (Docs. 166, 167.)

[5] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on February 8, 2005. Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). (Doc. 43.)

1    If the moving party meets its initial responsibility, the burden then shifts to the opposing
2 party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.
3 Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence
4 of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is
5 required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery
6 material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475
7 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e.,
8 a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby,
9 Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d
10 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable
11 jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d
12 1433, 1436 (9th Cir. 1987).

13    In the endeavor to establish the existence of a factual dispute, the opposing party need not
14 establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual
15 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
16 trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce
17 the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
18 Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963
19 amendments).

20    In resolving the summary judgment motion, the court examines the pleadings, depositions,
21 answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ.
22 P. 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all
23 reasonable inferences that may be drawn from the facts placed before the court must be drawn in
24 favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369
25 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is
26 the opposing party's obligation to produce a factual predicate from which the inference may be
27 drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810
28 F.2d 898, 902 (9th Cir. 1987).

1       Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show
2  that there is some metaphysical doubt as to the material facts. Where the record taken as a whole
3  could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for
4  trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

   C.  Undisputed Facts[6]

1.  Plaintiff is a validated associate of a prison gang and is serving an indeterminate term in a Security Housing Unit (SHU) at Corcoran State Prison (Corcoran).

2.  Plaintiff has an extensive history of prison disciplinary violations, which include assaults on staff and other inmates, disruptive behavior, destruction of state property, refusals to follow orders, and false allegations.

3.  On May 9, 1995, shortly after being returned to prison for parole violations, a clinical psychologist at Deuel Vocational Institution-Reception was asked to evaluate Plaintiff for mental illness. Plaintiff reported that he had begun feeling paranoid about three years before, believed he was going to be poisoned, and did not trust anyone. Plaintiff was diagnosed as follows: Axis I - Cocaine-Induced Psychotic Disorder, paranoid delusions (hallucinations in remission), cocaine dependence and depressive symptoms; Axis II - Antisocial Personality Disorder; and Axis III - none.

4.  Subsequently, on July 8, 1998, Plaintiff was diagnosed with Delusional Disorder, somatic type with mild paranoia and persecutory thoughts (DSM-VI 297.1). Plaintiff believed that custody staff were out to harm him. Plaintiff's somatic delusion manifested itself in multiple physical symptoms, essentially clustered on his feelings of being poisoned by custody staff who he believed were tampering with his food, causing weight loss and hair loss. A few months later, on November 19, 1998, Plaintiff claimed correctional officers were racists and were poisoning his food because he was Black. Plaintiff claimed that the food poisoning caused abdominal pain and frequent urination. Plaintiff has been seen on numerous occasions by medical staff for medical complaints he claims are due to food tampering, but

---

[6] Plaintiff neither admitted or denied the facts set forth by Defendants as undisputed nor filed a separate statement of disputed facts. Local Rule 56-260(b).

4

|   |   |
|---|---|
|   | no medical problems due to food poisoning have been found.  Instead, medical staff have treated him for conditions such as hemorrhoids and urinary infections and have diagnosed him with hepatitis B and C, but have concluded that he is not a candidate for combination therapy with pegylated interferon and ribavarin because of his ongoing mental illness. |
| 5. | In September 1998, a clinical psychologist at Pelican Bay State Prison evaluated Plaintiff and stated, "Plaintiff's somatic delusions involve multiple physical symptoms and essentially cluster on his feelings of being poisoned and weight loss as well as his hair falling out. The persecutory nature is that he believes that he has been poisoned by Custody or they're tampering with his food." |
| 6. | On October 17, 2001, Plaintiff was received at Corcoran for an indeterminate SHU term based on behavior that led to his validation as a prison gang associate. |
| 7. | Plaintiff was initially housed in the Facility 4B SHU. |
| 8. | All food served to inmates housed in Corcoran's SHUs, which are located in Facilities 4A and 4B, is prepared in the institution's main kitchen three to five days before it is served as indicated on the weekly menu.  All cooked food is blast chilled and portioned into two-inch sanitized pans and placed in food transport carts.  The loaded carts are stored in a walk-in refrigerator until they are distributed to the Level IV kitchen.  The Level IV kitchen receives carts each day which contain that day's dinner meals and the following day's breakfast meals. The meals are reheated in the Level IV kitchen and then sent to the SHU buildings by truck. Building officers are responsible for serving the food after it arrives.  The officers are required to wear hats, plastic gloves, and aprons when serving food.  Each building in the SHU has a steam table to maintain the food serving temperature at 140 degrees.  The pans containing the reheated food are placed in the steam tables in each building.  Sanitized serving trays are also provided to the buildings.  The building officers have menu and meal sampler report prepared by the main kitchen which indicates the serving size or any menu changes.  The officers fill each serving tray according to the menu.  Building officers then deliver the filled trays to each inmate through a cell port.  When a meal is completed, the |
| /// |   |

|   |     |                                                                                       |
|---|-----|---------------------------------------------------------------------------------------|
| 1 |     | building officers collect the serving trays and return them with the pans to the Level IV |
| 2 |     | kitchen to be cleaned and sanitized.  The process is then repeated for the next meal. |
| 3 | 9.  | On December 2, 2001, Plaintiff was moved to a cell with inmate Blakeney. |
| 4 | 10. | Although Plaintiff claims he saw Blakeney "sabotage" coffee Plaintiff had gotten from the |
| 5 |     | canteen, causing Plaintiff to become severely ill, and Capt. Andrews and Sgt. Jackson then |
| 6 |     | had Blakeney remove the "contaminated" coffee while Plaintiff was at the law library, |
| 7 |     | Plaintiff later told correctional staff a story that did not involve claims of officer misconduct. |
| 8 | 11. | On January 21, 2002, Plaintiff and Blakeney asked to be separated, and Sgt. Jackson |
| 9 |     | accommodated them by moving Blakeney to a cell in a different section of Facility 4B. |
| 10 | 12. | On January 24, 2002, Dr. Gharakhanian saw Plaintiff at his cell in Facility 4B to review his |

building officers collect the serving trays and return them with the pans to the Level IV kitchen to be cleaned and sanitized. The process is then repeated for the next meal.

9. On December 2, 2001, Plaintiff was moved to a cell with inmate Blakeney.

10. Although Plaintiff claims he saw Blakeney "sabotage" coffee Plaintiff had gotten from the canteen, causing Plaintiff to become severely ill, and Capt. Andrews and Sgt. Jackson then had Blakeney remove the "contaminated" coffee while Plaintiff was at the law library, Plaintiff later told correctional staff a story that did not involve claims of officer misconduct.

11. On January 21, 2002, Plaintiff and Blakeney asked to be separated, and Sgt. Jackson accommodated them by moving Blakeney to a cell in a different section of Facility 4B.

12. On January 24, 2002, Dr. Gharakhanian saw Plaintiff at his cell in Facility 4B to review his mental status and medications. Dr. Gharakhanian noted that Plaintiff had been on Zyprexa, 20 mg. q.h.s. and Risperdal, 3 mg. b.i.d. until January 15, 2002, when the medications were discontinued because of Plaintiff's noncompliance. Plaintiff told Dr. Gharakhanian that he was hearing voices, but became upset and said he did not want to talk at the cell door. Plaintiff was taken to a holding cage, but he complained about being interviewed there and about the lack of doctor-patient confidentiality. When asked if he was suicidal or homicidal, he refused to answer questions. Because Dr. Gharakhanian was unable to evaluate Plaintiff in that location, he referred him to the emergency room where he was evaluated there by Dr. Pitts, who diagnosed him as psychotic NOS (not otherwise specified), R/O (rule out) paranoid schizophrenia. Dr. Pitts prescribed oral Risperdal, 3 mg., Ativan 2 mg., and Inderal, 20 mg., which Plaintiff took, and admitted him to the Mental Health Crisis Unit (MHCU). Mental health staff saw Plaintiff on January 25, 26, and 27, and he told them that he was doing better on the medications, but again claimed that staff were putting things in his food. Plaintiff improved on medication and was discharged on January 28, 2002. While Plaintiff was in the hospital, Dr. Pitts ordered a number of standard tests because of Plaintiff's medical complaints. These included PSA (prostate specific antigen), CBC, hepatitis panel, and BUN blood tests. Those tests would have required blood draws using a needle.

6

13. On January 30, 2002, Plaintiff submitted a grievance (CDC 602 Log No. CSP-02-00498), complaining that Dr. Pitts had tested him or given him drugs while he was unconscious during his stay in the Acute Care Hospital. The grievance was denied at the first level on April 18, 2002, by Dr. Pitts because Plaintiff had consented to have blood drawn on January 26, 2002, for the PSA test which was normal.

14. Plaintiff was admitted to the ACH a few days later on February 5, 2002, claiming he was suicidal and hearing voices, and that people were putting something in his food. Plaintiff also claimed that he had stomach cramps and abdominal pain. There is no medical evidence that he had food poisoning. Plaintiff was discharged on February 13, 2002.

15. On June 3, 2002, Plaintiff was charged with a disciplinary violation for refusing to return for yard recall.

16. On June 14, 2002, Plaintiff was charged with a disciplinary violation for refusing to allow an officer to close his food port after breakfast because of "staff fucking with" him.

17. On July 6, 2002, Sgt. Weaver interviewed Plaintiff about a grievance (No. CSP-Corcoran 02-01826) claiming that staff had been serving him tainted food and that Sgt. Jackson had done nothing to correct the misconduct. Sgt. Weaver found that there was no evidence to support the claim.

18. On January 4, 2003, Officer Fisher was working in Facility 4A3L, a SHU unit. Around 9:45 a.m. that morning, Officer Fisher was collecting breakfast trays from inmates in the housing unit, when Plaintiff refused to return his tray, claiming that Fisher and Officer Oseguera had sabotaged his food. Officer Fisher notified Sgt. Reynoso, who came to the cell with Sgt. Trujillo. Sgt. Reynoso sprayed Plaintiff with pepper spray through the cell food port.[7] Sgt. Reynoso then told Officers Fisher and Oseguera to handcuff Plaintiff, escort him to a shower, and decontaminate him. Officers Fisher and Oseguera then took Plaintiff to the shower.[8] V. Suarez, a licensed vocational nurse, evaluated Plaintiff for injuries, but found none.

---

[7] There is a dispute between the parties over whether, prior to being sprayed, Plaintiff was banging his food tray and refusing orders to stop the behavior, or merely sitting on his bunk with his food tray on the toilet.

[8] There is a dispute between the parties over whether Plaintiff was decontaminated or not.

7

1  Suarez then recommended that Plaintiff be taken to the ACH for a psychological evaluation.
2  Officers Fisher and Oseguera then took Plaintiff to a holding cell in the rotunda and from
3  there to the ACH. Dr. Hasadsri examined Plaintiff and did not see anything out of the
4  ordinary, except red eyes from the pepper spray. Plaintiff was examined at the ACH, and
5  Officers Fisher and Oseguera then escorted him to Unit 3 where he was admitted and placed
6  a mental health crisis bed.

19. On July 22, 2003, Plaintiff was seen in the emergency room for suicidal and homicidal ideation, claiming that he was seeing things moving in his cell and hearing voices, that officers were putting things in his food, that he was in imminent danger, and that he would hang himself. Dr. Dang thought Plaintiff should see a psychiatrist. Plaintiff was admitted to the Mental Health Crisis Unit (MHCU) for major depression with psychotic features, placed on suicide precautions, and prescribed Prozac 20 mg. a day and Risperdal, 2 mg. every h.s. An interdisciplinary treatment team saw Plaintiff the following day and noted that Plaintiff had refused to take the prescribed medications, claiming he did not need them and that his mental status at that time permitted discharge back to his housing unit.

20. Plaintiff was diagnosed on September 21, 2005, as Axis I - Schizophrenia, paranoid type; Axis II - Antisocial Personality Disorder; Axis III - Hepatitis B and C, for which he is excluded from Interferon treatment due to poorly controlled mental illness.

21. Plaintiff's mental disorder is very difficult to treat, primarily because he is so paranoid and nervous, and because he refuses to cooperate with treatment, except on a very limited basis. To the extent he is willing to cooperate, it is not sufficient to address his mental disorder. For example, in May 2007, Plaintiff missed 24 doses of the 51 doses of medication he had been prescribed. That is almost 50% of his psychotropic medication. This pattern of resistance to treatment and medication noncompliance has been pervasive for all the years Plaintiff has been receiving mental health treatment while in CDCR custody. Typically, psychotropic medication cannot be effective unless it is taken as prescribed.

22. Plaintiff also refuses medical services. In February, March, and April 2007, Plaintiff refused a variety of medical services, including having his vital signs taken, refusing an ear flush, and

8

|   |   |
|---|---|
|   | twice refusing the M.D. Line. That is small sample of his overall lack of cooperation with medical services. Medical staff have never found any evidence that Plaintiff's medical complaints are due to poisoning or tampering with his food. Plaintiff's belief is due to a delusion caused by his mental illness. |
| 23. | Because of Plaintiff's noncompliance with treatment and overall suspiciousness of everyone, it is very difficult for him to improve, and he does not meet the criteria at present for involuntary medication. If Plaintiff were to invest some time and effort in his mental health rehabilitation, he might see a marked improvement in his overall mental health and outlook. However, treating staff are unable to test whether his delusions of being poisoned could be dispelled because of his ongoing failure to comply with treatment. |

D.   Plaintiff's Claims

  1.   Eighth Amendment Food Tampering Claim

Plaintiff alleges that Defendants Andrews, Grandy, Weaver, Fehlman, Warren, Cheema, Rojas, Casillas, Loflin, Hernandez, Romero, Licon, Espinoza, Fisher, Oseguera, and Do Canto tampered with his food, in violation of the Eighth Amendment. Plaintiff alleges that staff repeatedly sabotaged his food trays and canteen items with urine, feces, saliva, and hair, and served him food that was spoiled and purposely burned to a crisp with a cigarette lighter. (Doc. 22, 4th Amend. Comp.) Plaintiff alleges that the contamination caused him to become violently ill, and bleed from his rectum and penis. (Id.)

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain . . . ." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety. Id.; Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982). Where a prisoner alleges injuries stemming from unsafe conditions of confinement, prison officials may be held liable only if they acted with "deliberate indifference to a substantial risk of serious harm." Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

///

The deliberate indifference standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious . . . ." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Second, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." Farmer, 511 U.S. at 837. Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. Id. at 837-45.

In support of their motion for summary judgment, Defendants submit evidence that Plaintiff suffers from a number of mental illnesses, which cause him to suffer delusions that he is being poisoned by staff. (Undisputed Facts 3, 4, 5, 12, 20, 21, 22.) Further, Plaintiff's mental illness is difficult to treat because of Plaintiff's paranoia and nervousness, and Plaintiff is not fully cooperative with treatment. (U.F. 21, 23.) Because Plaintiff's limited cooperativeness is not sufficient to address his mental illness, staff are unable to determine whether Plaintiff's delusions could be dispelled with treatment. (Id.) Medical staff have never found any evidence that the medical problems complained of by Plaintiff were caused by poisoning or food tampering. (U.F. 22.)

Although Plaintiff opposes Defendants' motion, his opposition is unverified and is not accompanied by any evidence.[9] (Doc. 175.) Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). Plaintiff has not done so.

Further, while Plaintiff's complaint is verified and is treated as an opposing affidavit by the Court, Moran v. Selig, 447 F.3d 948, 759-60 (9th Cir. 2006); Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004), it is bare of specific factual information supporting Plaintiff's claims that Defendants Andrews, Grandy, Weaver, Fehlman, Warren, Cheema, Rojas, Casillas, Loflin,[10] Hernandez,

---

[9] Even if Plaintiff's opposition had been verified, it is very conclusory in nature and is devoid of specific facts supporting the claims in this action.

[10] Identified as Lofflin in the complaint.

Romero, Licon, Espinoza, Fisher, Oseguera, and Do Canto poisoned him and otherwise tampered with his food. Plaintiff may not simply rest on his assertion that the incidents occurred.

Because Plaintiff has not tendered any evidence supporting his claims or bringing into dispute Defendants' position that he suffers from mental illness which manifests in the delusional belief that he is being poisoned by staff, Defendants are entitled to summary adjudication on the claims against them.

### 2. Eighth Amendment Excessive Force Claim

In his verified complaint, Plaintiff alleges that Defendants Oseguera and Key used excessive physical force against him, in violation of the Eighth Amendment. Plaintiff alleges that on January 4, 2003, after being pepper sprayed by Sgt. Reynoso, he was dragged out of his cell by Defendants Key and Oseguera and taken to the rotunda, where he was slammed against a wall, kicked, and punched.[11] (Doc. 22, 4th Amend. Comp., ¶77.) Plaintiff alleges he injured his shoulder and suffered "severe physical injuries." (Id.)

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Id. (internal quotation marks and citations omitted). "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." Id.

"The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency." Id. (internal quotation marks and citations omitted). The malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether or not significant injury is evident. Id. at 9; see also Oliver v. Keller, 289 F.3d

---

[11] Sgt. Reynoso was dismissed from this action on January 30, 2007.

11

623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines de minimis uses of force, not de minimis injuries)). However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (internal quotations marks and citations omitted).

On January 4, 2003, Officer Fisher was working in Facility 4A3L, a SHU unit. (U.F. 18.) Around 9:45 a.m. that morning, Officer Fisher was collecting breakfast trays from inmates in the housing unit. (Id.) Defendants contend that Plaintiff refused to return his tray, claiming that Fisher and Officer Oseguera had sabotaged his food. (Doc. 171-5, Fisher Dec., ¶4.) Defendants contend that after Officer Fisher notified Sgt. Reynoso, who came to the cell with Sgt. Trujillo, Plaintiff tried to break the tray by banging it against a wall and refused orders to stop. (Id.) After Sgt. Reynoso sprayed Plaintiff with pepper spray through the cell food port, Defendants contend that Plaintiff stopped his behavior and returned the tray. (Id.) Sgt. Reynoso then told Officers Fisher and Oseguera to handcuff Plaintiff, escort him to a shower, and decontaminate him. (U.F. 18; Fisher Dec., ¶4.) Officers Fisher and Oseguera then took Plaintiff to the shower. (Id.) Defendants contend that Officer Key was not present, and that Officer Fisher and Defendant Oseguera did not slam Plaintiff against a wall, injure his shoulder, punch and kick him, or refuse to allow him to be decontaminated. (Fisher Dec., ¶4.) Defendants contend that when Fisher and Defendant Oseguera got to the shower, cool water was run over Plaintiff for several minutes to remove the pepper spray. (Id.)

Defendants contend that Defendant Suarez supervised the decontamination and evaluated Plaintiff for injuries, but found none. (Id.) Defendant Suarez then recommended that Plaintiff be taken to the ACH for a psychological evaluation. (U.F. 18.) Officer Fisher and Defendant Oseguera took Plaintiff to a holding cell in the rotunda and from there to the ACH. (Id.) Defendants deny that at the hospital, they tried to persuade Dr. Hasadsri not to decontaminate Plaintiff or provide medical treatment to Plaintiff. (Fisher Dec., ¶4.) Dr. Hasadsri examined Plaintiff and did not see anything out of the ordinary, except red eyes from the pepper spray. (U.F. 18.) Plaintiff was examined at the

12

ACH, and Officers Fisher and Oseguera then escorted him to Unit 3 where he was admitted and placed a mental health crisis bed. (Id.)

Plaintiff has not submitted any evidence in support of his opposition to Defendants' motion for summary adjudication on this claim. Plaintiff has not refuted Defendants' evidence that Key was not present during the incident, and Plaintiff's bare allegation in his complaint that he was slammed against the wall, punched, and kicked, and sustained a shoulder injury and other unspecified injuries is insufficient to create a triable issue of fact on his claim against Osegura.

Assuming the truth of Plaintiff's allegations that he was unresistant and physical force was used against him during the escort, in order to violate the Eighth Amendment, the force allegedly employed must be malicious and sadistic, not merely objectively unreasonable. Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002). As such, Plaintiff is required to submit some evidence to support of his claim that the force used against him was excessive and that Defendant Oseguera acted sadistically and maliciously toward him. Plaintiff may not rest upon a conclusory description of the alleged event in his complaint, as the event as described does not rise to the level of sadistic and malicious conduct. As previously noted, Plaintiff was notified of the requirements of opposing a motion for summary judgment. (Doc. 43.) Defendants Key and Oseguera are entitled to summary adjudication on the claim against them.

                3.        Eighth Amendment Medical Care Claim

Plaintiff alleges that Defendants Brown, Pitts, Hasadsri, Dang, Andrews, and Suarez acted with deliberate indifference to his medical needs by failing to provide him with medical treatment, in violation of the Eighth Amendment. On January 24, 2002, Defendant Brown allegedly refused to examine Plaintiff for his complaint of blood in his stool and his penis as a result of poisoning. (4th Amend. Comp., ¶47.) Plaintiff alleges he was sent to the Acute Crisis Hospital, where he was interviewed by Defendant Pitts, who was told to "sabotage and drug" Plaintiff by Defendant Andrews. (Id., ¶48.) On January 4, 2003, following the incident in which Plaintiff was sprayed with pepper spray, Defendant Suarez allegedly saw Plaintiff in the holding cage in the rotunda, but failed to decontaminate him despite his complaints of burning. (Id., ¶78.) Plaintiff alleges that Defendant Hasadsri failed to provide medical treatment for his severe injuries or decontaminate him despite his

complaints of pain. (Id.) On July 22, 2003, Defendant Dang allegedly failed to provide him with medical treatment for his complaints. (Id., ¶¶84, 85,)

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)). The two part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (citing McGuckin at 1060 (internal quotations omitted)). Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

Defendants submit evidence that on January 24, 2002, Plaintiff was referred to the emergency room by Dr. Gharakhanian because Dr. Gharakhanian was unable to evaluate Plaintiff in his unit and Plaintiff would not respond when questioned whether he was suicidal or homicidal. (U.F. 12.) Plaintiff was evaluated by Defendant Pitts and diagnosed as psychotic. (Id.) Defendant Pitts prescribed some medication and Plaintiff was admitted to the Mental Health Crisis Unit. (Id.) Plaintiff was seen by staff over the course of the following three days and improved on medication, leading to his discharge on January 28, 2002. (Id.) A number of tests were ordered by Defendant Pitts for Plaintiff's medical complaints, including PSA, CBC, hepatitis panel, and BUN blood tests. (Id.)

1    Defendants contend that on January 4, 2003, Defendant Suarez supervised the
2 decontamination of Plaintiff following the incident in which he was sprayed with pepper spray and
3 evaluated Plaintiff for injuries, but found none. (Fisher Dec., ¶4.) Defendant Suarez recommended
4 Plaintiff be taken the ACH for a psychological evaluation. (U.F. 18.) At the ACH, Defendant
5 Hasadsri examined Plaintiff but found nothing out of the ordinary except for red eyes from the
6 pepper spray. (Id.) Plaintiff was examined, and admitted and placed in a mental health crisis bed.
7 (Id.)

8    Finally, Defendants submit evidence that on July 22, 2003, Plaintiff was seen at the
9 emergency room for suicidal and homicidal ideation and claims that he was seeing things move in
10 his cell and hearing voices, that officers were putting thing in his food, that he was in imminent
11 danger, and that he was going to hang himself. (U.F. 19.) Defendant Dang thought Plaintiff should
12 see a psychiatrist and Plaintiff was admitted to the Mental Health Crisis Unit for major depression
13 with psychotic features. (Id.) Plaintiff was prescribed medication and suicide precautions were
14 implemented. (Id.)

15    "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060
16 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from
17 which the inference could be drawn that a substantial risk of serious harm exists,' but that person
18 'must also draw the inference.'" Id. at 1057 (quoting Farmer, 511 U.S. at 837). "'If a prison official
19 should have been aware of the risk, but was not, then the official has not violated the Eighth
20 Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada,
21 290 F.3d 1175, 1188 (9th Cir. 2002)). Further, "[a] difference of opinion between a prisoner-patient
22 and prison medical authorities regarding treatment does not give rise to a s 1983 claim." Franklin
23 v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted). To prevail, plaintiff
24 "must show that the course of treatment the doctors chose was medically unacceptable under the
25 circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to
26 plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986) (internal citations
27 omitted).
28 ///

On the dates in questions, Plaintiff was seen by medical personnel. Plaintiff has submitted no evidence supporting his claim that Defendants Brown, Pitts, Hasadsri, Dang, Andrews, and Suarez knew of and disregarded an excessive risk to Plaintiff's health. While Plaintiff may have disagreed with the decisions of Defendants with respect to his complaints and treatment, this disagreement is insufficient to rise to the level of an Eighth Amendment violation. Jackson, 90 F.3d at 332. The conclusory allegations in the complaint are insufficient to show that Defendants acted in a manner which rose to the level of deliberate indifference. Jett, 439 F.3d at 1096; Toguchi, 391 F.3d at 1060. Defendants are entitled to summary adjudication on Plaintiff's medical care claims against them.

### 4. Fourteenth Amendment Due Process Claim

Finally, Plaintiff alleges that on January 24, 2002, Defendants Pitts and Andrews were involved in drugging him and conducting tests on him while he was unconscious, in violation of the Due Process Clause. (4th Amend. Comp., ¶48.) See Nunez v. City of Los Angeles, 147 F.3d 867, 871 (9th Cir. 1998) ("The concept of substantive due process . . . forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.") (citation and internal quotation marks omitted).

Defendants submit evidence that while Plaintiff was in the hospital following his admission on January 24, 2002, Defendant Pitts ordered a number of standard tests because of Plaintiff's medical complaints. (U.F. 12.) These tests included PSA, CBC, hepatitis panel, and BUN blood tests, and would have required blood draws using a needle. (Id.) Further, Defendants submit evidence that Plaintiff had consented to have blood drawn on January 26, 2002, for the PSA test, and Defendants contend that Plaintiff was not unconscious during the hospitalization. (U.F. 13; Doc. 171-2, pg. 77; Doc. 171-5, Hasadrsi Dec., ¶4; Doc. 171-5, Jordan Dec., ¶8 .)

Plaintiff has not submitted any evidence in support of his claim that he was rendered unconscious while in the hospital and that Defendants Pitts and Andrews had tests conducted on him without his consent. Plaintiff's conclusory allegations in his complaint are insufficient to raise a triable issue of fact and defeat Defendants' motion for summary adjudication on this claim.

II.     Plaintiff's Motion for Preliminary Injunctive Relief

On October 22, 2007, Plaintiff filed a motion seeking an order prohibiting California Department of Corrections and Rehabilitation officials from retaliating against him by tampering with his food, water, and canteen purchases; slandering him; transferring him to the Psychiatric Security Unit at Pelican Bay State Prison; denying him medical and mental health care; monitoring Plaintiff's legal correspondence; and denying Plaintiff access to the inmate appeals system and the United States mail system. Defendants did not file a response.

The purpose of a preliminary injunction is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). In this instance, Plaintiff has not presented sufficient evidence to raise a triable issue of fact as to his claims and Defendants are entitled to summary judgment. As a result, other deficiencies of the motion aside, there is no basis upon which Plaintiff may seek a preliminary injunction, City of Los Angeles v. Lyons, 461 U.S. 95, 101, 103 S.Ct. 1660, 1665 (1983); Jones v. City of Los Angeles, 444 F.3d 1118, 1126 (9th Cir. 2006), and his motion shall be denied.

III.    Order

Based on the foregoing, it is HEREBY ORDERED that:

1.  Plaintiff's motion for preliminary injunctive relief, filed October 22, 2007, is DENIED;
2.  Defendants' motion for summary judgment, filed July 2, 2007, is GRANTED;[12] and
3.  The Clerk of the Court shall enter judgment for Defendants and against Plaintiff.

IT IS SO ORDERED.

**Dated:   February 25, 2008**            /s/ Anthony W. Ishii
                                          UNITED STATES DISTRICT JUDGE

---

[12] Because Defendants are entitled to summary judgment on the merits of Plaintiff's claims against them, the Court does not reach Defendants' qualified immunity argument.